107 Cal.Rptr.2d 84 (2001)
89 Cal.App.4th 61
The PEOPLE, Plaintiff and Respondent,
v.
Michael Clayton PHILLIPS, Defendant and Appellant.
No. H020377.
Court of Appeal, Sixth District.
May 16, 2001.
As Modified on Denial of Rehearing June 7, 2001.
Review Granted September 12, 2001.
*86 The Law Offices of Robert L.S. Angres, Robert L.S. Angres, under appointment by the Court of Appeal, Attorney for Defendant and Appellant: Michael Clayton Phillips.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Senior Assistant Attorney General, Rene A. Chacon, Supervising Deputy Attorney General, Ronald E. Niver, Deputy Attorney General, Attorneys for Respondent: The People.
*85 BAMATTRE-MANOUKIAN, J.
Defendant Michael Clayton Phillips appeals after conviction, by jury trial, of possession for sale of cocaine (count 1, Health & Saf.Code, § 11351), possession for sale of cocaine base (count 2, Health & Saf. Code, § 11351.5), possession of a firearm by a felon (counts 3 & 7, Pen.Code, § 12021, subd. (a)(1)), transportation of cocaine (count 4, Health & Saf.Code, § 11352, subd. (a)), possession of cocaine (count 5, Health & Saf.Code, § 11350, subd. (a)), possession of cocaine while armed with a firearm (count 6, Health & Saf.Code, § 11370.1, subd. (a)), and carrying a concealed firearm in a vehicle (count 8, Pen.Code, § 12025, subd. (a)(1)).
The jury found that defendant was armed with a firearm (Pen.Code, § 12022, subds. (a) & (c)) in the commission of counts 1, 2, 4, and 5; that defendant was ineligible for probation (Pen.Code, § 1203.073, subds. (b)(1) & (5)); that the cocaine involved in count 1 weighed over one kilogram (Health & Saf.Code, *87 § 11370.4, subd. (a)(1)); and that defendant was on bail when he committed counts 1, 2, and 3 (Pen.Code, § 12022.1). Defendant admitted that he had two prior convictions of selling, transporting, or possessing for sale narcotics (Health & Saf. Code, § 11370.2, subd. (a)) and that he had served three prior prison terms (Pen.Code, § 667.5, subd. (b)).
The trial court initially sentenced defendant to an aggregate prison term of 19 years but later filed an order augmenting the sentencing record, which resulted in a reduction of defendant's sentence to an aggregate prison term of 18 years, 4 months.
On appeal, defendant contends the trial court erred by: (1) denying his motion to suppress; (2) striking a defense witness's testimony after the witness invoked his Fifth Amendment privilege against self-incrimination; and (3) instructing the jury pursuant to CALJIC No. 17.41.1. Defendant also contends there was insufficient evidence to support the quantity enhancement alleged as to count 1. Finally, he asserts various sentencing errors.
We will reverse the judgment, order the quantity enhancement imposed under Health and Safety Code section 11370.4, subdivision (a)(1) stricken, and remand for resentencing.

I. BACKGROUND
On August 27, 1998, at about 9:00 p.m., Seaside Police Officers Christopher Veloz and Steven Wright were dispatched to the Mission Memorial Cemetery pursuant to a report from a concerned citizen about of three trespassers in the cemetery.
When the officers arrived at the cemetery, it was closed. There were no lights on, and there was a chain across the entrance preventing people from driving into the cemetery. The officers illuminated the cemetery area with their spotlights. They did not see anyone, but they did notice a blue Cadillac Seville parked outside the cemetery. The vehicle was similar to the one described in the broadcast. No one was inside the Cadillac.
The officers left. However, about 20 minutes later, the concerned citizen called again. She had seen the officers near the Cadillac, and stated that it was the trespassers' car. The concerned citizen offered to speak directly to the officers and also offered to give her name and address.
The officers drove back towards the cemetery, in separate vehicles. Officer Wright observed the Cadillac, which contained four people, driving "very rapidly" away from the cemetery. He turned his patrol car around in order to follow the Cadillac, and sent out a message over the police radio. Officer Veloz observed the Cadillac and initiated a traffic stop by turning on his patrol car's emergency lights. However, the Cadillac did not stop immediately; it continued on for about 200 yards. Officer Veloz observed defendant, the driver, "leaning over towards the center portion of the vehicle."
After stopping, defendant exited the Cadillac, while the three passengers remained inside. It appeared defendant was thinking about running away. Officer Veloz ordered defendant to get back into the Cadillac. Defendant complied. The officers had the four people get out and identify themselves. The three passengers were Ronald Johnson, Kenneth Bryant, and Timothy Dunn. Both Johnson and Bryant were on parole at the time.
The officers searched the vehicle. In between the two front seats, they discovered a handgun, which had been stolen during a burglary sometime earlier in the year. The officers also noticed that the Cadillac had a compact disc (CD) player with a removable faceplate.
*88 Defendant was arrested and transported to the police department, where he was searched. Police found rock cocaine in his shoe (5.18 grams), in a jacket pocket (2.27 grams), and between his buttocks (5.33 grams). They also found some marijuana in his pocket. Defendant had a pager and $241 cash on his person. Ronald Johnson and Kenneth Bryant were also arrested, on parole violations. Johnson, too, had rock cocaine between his buttocks.
Defendant was charged with five narcotics and firearms offenses, along with numerous enhancement allegations, in case number SM980599. He was released on bail pending trial.
On February 12, 1999, at about 3:00 p.m., police served a search warrant at 1669 Luzern Street in Seaside. Defendant's blue Cadillac was parked outside the residence. In one of the bedrooms, the police found numerous letters and bills addressed to defendant, insurance cards and a prescription bottle with defendant's name, photographs of defendant with other people, the jacket that defendant wore on August 27, 1998, and a nylon case designed to hold the detachable face of a CD player.
In the bedroom closet, the police discovered a loaded revolver and a small safe, which contained a wrapped package of cocaine weighing 988.74 grams, razor blades and a bundle of money wrapped in rubber bands. The police also searched a second bedroom at the Luzern Street residence, which appeared to be a child's bedroom. Underneath a dresser in that bedroom, they found a baggie of cocaine base weighing 24.64 grams.
Defendant was charged with three narcotics and firearm offenses, as well as additional enhancement allegations, in case number SS990710. The prosecution moved to consolidate case numbers SM980599 and SS990710. (Pen.Code, § 954.) The trial court granted the motion. In the consolidated information, the three offenses from case number SS990710 (the February 12, 1999, offenses) were designated as counts 1-3 and the five offenses from case number SM980599 (the August 27, 1998, offenses) were designated as counts 4-8.
After consolidation, the charges were as follows: count 1, possession for sale of cocaine (Health & Saf.Code, § 11351); count 2, possession for sale of cocaine base (Health & Saf.Code, § 11351.5); count 3, possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)); count 4, transportation of cocaine (Health & Saf. Code, § 11352, subd. (a)); count 5, possession of cocaine (Health & Saf.Code, § 11350, subd. (a)); count 6, possession of cocaine while armed with a firearm (Health & Saf.Code, § 11370.1, subd. (a)); count 7, possession of a firearm by a felon (Pen.Code, § 12021, subd. (a)(1)); and count 8, carrying a concealed firearm in a vehicle (Pen.Code, § 12025, subd. (a)(1)).
As to count 1, the information alleged that the cocaine weighed over one kilogram (Health & Saf.Code, § 11370.4, subd. (a)(1)). As to counts 1, 2, 4, and 5, the information alleged that defendant was armed with a firearm (Pen.Code, § 12022, subds. (a) & (c)). As to counts 1, 2, and 3, the information alleged that defendant committed the offense while on bail (Pen. Code, § 12022.1). The information also alleged that defendant had two prior convictions of selling, transporting, or possessing for sale narcotics (Health & Saf.Code, § 11370.2, subd. (a)); that defendant was ineligible for probation (Pen.Code, §§ 1203.07, subd. (a)(11), 1203.073, subd. (b)(1)); and that defendant had served three prior prison terms (Pen.Code, § 667.5, subd. (b)).
Before trial began, defendant admitted the prior narcotics conviction allegations *89 and the prior prison term allegations. He also admitted that he was a felon for purposes of counts 3 and 7.
At trial, defendant sought to prove that he did not live at the residence on Luzern Street, but with his girlfriend, Billie Joe Jackson. Jackson testified that defendant had been living with her and her five children in an apartment at 565 Amador Street since March of 1998. Eleanor De-Franco, who lived at 545 Amador Street, had previously told an investigator that defendant lived at 565 Amador Street. Norma Garcia, whose mother-in-law lived at 555 Amador Street, believed that defendant lived at 565 Amador Street. She had seen defendant's blue Cadillac parked there "a lot." Renard Phillips, defendant's brother, testified that defendant no longer lived at the Luzern Street residence. However, Renard Phillips acknowledged that defendant sometimes stayed in the bedroom where the large block of cocaine was found.
The jury convicted defendant of all eight charged offenses and found true all of the associated allegations. At sentencing, the trial court imposed an aggregate prison term of 19 years. The trial court later filed an order purporting to clarify and augment the sentencing record, which resulted in a reduction of defendant's sentence to an aggregate prison term of 18 years, 4 months.

II. DISCUSSION

A. Detention/Motion to Suppress
On November 17, 1998, defendant filed a motion to suppress the evidence discovered during the incident on August 27, 1998. He argued that his detention was not justified by "reasonable suspicion" of criminal activity. (See People v. Souza (1994) 9 Cal.4th 224, 230-231, 36 Cal.Rptr.2d 569, 885 P.2d 982.)
"The Fourth Amendment to the United States Constitution prohibits seizures of persons, including brief investigative stops, when they are `unreasonable.' [Citations.] Our state Constitution has a similar provision. (Cal. Const., art. I, § 13.)" (People v. Souza, supra, 9 Cal.4th at p. 229, 36 Cal.Rptr.2d 569, 885 P.2d 982.) "[T]he temporary detention of a person for the purpose of investigating possible criminal activity may, because it is less intrusive than an arrest, be based on `some objective manifestation' that criminal activity is afoot and that the person to be stopped is engaged in that activity. [Citations.]" (Id. at p. 230, 36 Cal.Rptr.2d 569, 885 P.2d 982.)
"The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (People v. Glaser (1995) 11 Cal.4th 354, 362, 45 Cal.Rptr.2d 425, 902 P.2d 729.)
In denying defendant's motion to suppress, the trial court made the following findings: "The evidence is the cemetery was closed. It was a private cemetery. There was a chain across the entrance to the cemetery. The fact that there were not lights doesn't weigh heavily in my decision. But if, in fact, there were lights on at that time of night, and the chain wasn't there, I think one could reasonably assume that perhaps the cemetery was open, either for visitation or for some other purpose. [¶] But just the opposite was true on this particular night. The person that called in, I would characterize that person as a citizen informant, because even though she called in, she said and I heard *90 her say on the tape she'd be willing to talk to the officer, give her name and address. [¶] In fact, according to the evidence, she did do that at some point later on. She called not only once, but twice on the tape. The second time she called she said people in the car were still in the cemetery and wanted to know why the officers hadn't done anything about that.... She described the car as an Oldsmobile, black Oldsmobile. Well, it was a blue Cadillac, which I haven't heard any evidence about. But Cadillac and Oldsmobiles are about the same size cars, and generally about the same shape. [¶] But, anyway, it was the only car there. The same car that [Officer Veloz] saw when he went there the first time, and it's the same car Officer Wright told him had left the cemetery area.... [¶] The person called in, said there were three people, couldn't tell whether they were male or female. But when the officer first saw the car, there were four persons in the car. It's not surprising that somebody might think there are three people at night. In fact, there are four."
The trial court found that, under the totality of the circumstances, it was reasonable for the officers to believe that the people in the Cadillac had violated Penal Code section 647, subdivision (h). It noted that Penal Code section 647, subdivision (h) "makes it illegal for anybody to loiter or prowl on another person's private property at any time without visible or lawful business...."[1] The trial court ultimately ruled that "the detention was reasonable...."
In Santos v. Superior Court (1984) 154 Cal.App.3d 1178, 202 Cal.Rptr. 6 (Santos), the police observed three people standing in a parking lot that had been closed off to the public with barricades. Businesses near the parking lot were closed, and a municipal ordinance prohibited loitering around closed businesses. The court concluded that the police were justified in detaining the three individuals because they had a reasonable suspicion that the individuals were violating the municipal ordinance. (Id. at p. 1184 & fn. 1, 202 Cal.Rptr. 6.)
The instant case is analogous to Santos. The police received information from a concerned citizen that several people were trespassing in the cemetery, which was closed. The officers observed an empty Cadillac parked near the cemetery. The concerned citizen stated that the trespassers had arrived in the Cadillac and were still inside the cemetery. This information was corroborated when the police later observed several people driving away from the cemetery in the Cadillac. Based on the information they had at the time, the police could reasonably suspect that the people in the Cadillac had been violating Penal Code section 647, subdivision (h) by loitering, prowling, or wandering into the cemetery without visible or lawful business.
Defendant's reliance on People v. Roth (1990) 219 Cal.App.3d 211, 268 Cal.Rptr. 66 is misplaced. In that case, the police observed the defendant in a deserted parking lot of a shopping center, where the businesses were closed. The Roth court distinguished the Santos case, explaining that there was no indication the defendant's presence in the parking lot violated any law. Here, by contrast, the police reasonably suspected that defendant had *91 been loitering, prowling, or wandering in the private cemetery in violation of Penal Code section 647, subdivision (h).
We conclude that the police had reasonable suspicion to detain defendant. Therefore, the trial court properly denied defendant's motion to suppress the evidence discovered on August 27,1998.

B. Ronald Johnson's Invocation of Fifth Amendment
Ronald Johnson was the front seat passenger in the Cadillac on August 27, 1998. As a result of that incident, he was charged with carrying a concealed weapon in a vehicle (Pen.Code, § 12025, subd. (a)(1)); possession of cocaine (Health & Saf.Code, § 11350, subd. (a)); and possession of cocaine while armed with a firearm (Health & Saf.Code, § 11370.1, subd. (a)), along with an allegation that he had served a prior prison term (Pen.Code, § 667.5, subd. (b)).
At trial, Johnson was called as a defense witness. He explained that he had "made a plea bargain deal" after his arrest on August 27, 1998. He had pled guilty to "a dope case" and the firearm charge had been dismissed. He had been sentenced to 28 months in prison, and he was "serving [that] sentence right now."
On direct examination, Johnson testified that when Officer Veloz initiated the traffic stop, he tried to hide the cocaine in his pocket by placing it in between his buttocks. He testified that he was able to hide "everything" that he had on him.
At that point, defense counsel asked Johnson, "Now, there was a gun found in between the front two seats. Did you put that gun in there?" Johnson responded, "I can't answer that. I'm going to plead. I'm not going to incriminate myself on that. I can't answer that."
The prosecutor objected, arguing that Johnson had already been prosecuted "on this case." She specified that Johnson had pled guilty to the charge of possession of cocaine (count 6, Health & Saf.Code, § 11350, subd. (a)) and had admitted the prior prison term allegation.
At a bench conference, Johnson's attorney explained that he had performed research and believed that Johnson could still be prosecuted for the firearm possession charge. He had advised Johnson not to testify about the firearm unless he received a grant of immunity. The prosecutor stated she would not grant Johnson immunity.
The trial court indicated it would strike all of Johnson's testimony, explaining, "I don't think it's proper to have him testify to some things and invoking the Fifth [Amendment] as to others." Defense counsel argued that the trial court should compel Johnson to testify about the firearm, grant him immunity, or permit him to testify about "other aspects."
The trial court noted that limiting Johnson's testimony to matters other than the firearm possession could raise additional problems: "You can make the same argument with respect to possession for sale...." The prosecutor added, "Could be a transportation."
The trial court ultimately ordered the jury to disregard Johnson's testimony: "He has invoked the Fifth Amendment privilege against self-incrimination. There is some question as to whether that privilege still applies to him since this matter is an adjudicated matter and has already been finished. However, his counsel is of the opinion, with some justification, that he does have that privilege because he might be prosecuted for any offenses that he admits judicially on the witness stand that the People were not able to prove before, and Counsel has advised the Court that *92 even if the Court were to [r]eject the Fifth Amendment argument and order Mr. Johnson to testify, that counsel would advise his client not to testify anyway. And there is no sanction for that. Mr. Johnson is already in state prison, and so the Court determines that he is not adequately subject to cross-examination by the other side of the case, and it's unfair for him to be presenting some evidence and not responding to other aspects of the questioning there. There are other issues that would be in the same posture as his refusal to testify about this weapon, and so the Court is simply going to strike all of Mr. Johnson's testimony and order the jury to disregard it. It has not been cross-examined. It cannot be cross-examined. You're to disregard it as though you never heard it."
Defendant contends the trial court erred by striking Johnson's testimony. He claims the trial court's failure to order Johnson to testify violated his due process right to compel the attendance of witnesses on his behalf. (See In re Williams (1994) 7 Cal.4th 572, 603, 29 Cal.Rptr.2d 64, 870 P.2d 1072.) He argues that Johnson did not retain the privilege against self-incrimination as to the firearm possession charges because he was not subject to prosecution on those charges.
Defendant relies primarily on Ellsworth v. Superior Court (1985) 170 Cal.App.3d 967, 216 Cal.Rptr. 589. In that case, the defendant was charged with possession of a concealed weapon in a vehicle (Pen.Code, § 12025, subd. (a)) and possession of a weapon by a felon (Pen.Code, § 12021). He agreed to plead guilty to the Penal Code section 12021 charge in exchange for dismissal of the Penal Code section 12025 charge. The court concluded that the People could not rescind the plea bargain in order to prosecute the defendant on the dismissed charge. The court explained that the defendant had "relied heavily" on the plea bargain, in that he had pled guilty, been sentenced, and served his sentence. (Ellsworth v. Superior Court, supra, 170 Cal.App.3d at p. 974, 216 Cal. Rptr. 589.)
Ellsworth did not consider the question whether the defendant retained the privilege against self-incrimination; it simply held that the defendant could not be prosecuted on a dismissed charge after he had fully served his sentence.
The People point out that Johnson had not fully served his sentence at the time he was called to testify for the defense, and that he retained the privilege against self-incrimination if he had filed an appeal or if the time for filing an appeal had not expired. (See People v. Fonseca (1995) 36 Cal.App.4th 631, 635, 637, 42 Cal.Rptr.2d 525.) However, the record contains no evidence indicating whether Johnson had filed an appeal or could still file an appeal. Moreover, the People did not present this theory in the trial court, and defendant therefore had no opportunity to make an adequate record on the issue. It would therefore be unfair to defendant if we were to base our ruling on the lack of proof that Johnson had appealed or could still appeal. (See People v. Superior Court (Simon) (1972) 7 Cal.3d 186, 198, 101 Cal.Rptr. 837, 496 P.2d 1205.)
Even assuming that Johnson did not retain the privilege against self-incrimination, the trial court did not err by ordering his testimony stricken. The trial court appropriately focused on the fact that Johnson refused to testify on the advice of his attorney and therefore would not be "adequately subject to cross-examination by the other side of the case."
"Because it relates to the fundamental fairness of the proceedings, cross-examination is said to represent an `absolute right,' *93 not merely a privilege [citations], and denial or undue restriction thereof may be reversible error. [Citation.]" (Fost v. Superior Court (2000) 80 Cal.App.4th 724, 733, 95 Cal.Rptr.2d 620.) "Where a witness refuses to submit to cross-examination, or is unavailable for that purpose, the conventional remedy is to exclude the witness's testimony on direct. As stated in Witkin: `In either a civil or criminal case, where a party is deprived of the benefits of cross-examination of a witness by refusal of the witness to answer, the trial court may strike out the direct examination. [Citations.]' (3 Witkin, Cal. Evidence, [ (3d ed.1986) ] § 1877, p. 1831, original italics.). This rule applies even `where the refusal to answer is based on a valid claim of privilege.' (Ibid.) Where a witness refuses to submit to proper cross-examination regarding material issues, the striking out or partial striking out of direct testimony is common, and has been allowed even where the result was to deprive a criminal defendant of the fundamental constitutional right to testify in his own behalf. Striking a witness's entire testimony is, of course, a `drastic solution,' only to be employed `after less severe means are considered.' [Citations.] [¶] The logic of this rule applies as much to the situation in which the person who refuses to disclose is a defense witness as to that in which it is the defendant himself, as the refusal of a defense witness to submit to proper cross-examination may corrupt the factfinding process as much as the refusal to submit of the defendant himself. A criminal defendant's federal constitutional right to a fair trial, and specifically the Sixth Amendment right `to have compulsory process for obtaining witnesses in his favor,' cannot be deemed to include the right to call a witness who cannot be subjected to proper cross-examination...." (Fost v. Superior Court, supra, 80 Cal.App.4th 724, 735-736, 95 Cal.Rptr.2d 620, fn. omitted.)
In this case, we find no abuse of discretion in the trial court's decision to strike Johnson's testimony in its entirety when Johnson refused to testify about the firearm found in the car on the night of August 27, 1998. As the trial court recognized, the prosecutor's cross-examination of Johnson would have been significantly impeded if it allowed him to testify about only limited aspects of the short incident. (Cf. People v. Reynolds (1984) 152 Cal. App.3d 42, 47, 199 Cal.Rptr. 379.)

C. Quantity Enhancement
Defendant contends the evidence was insufficient, as a matter of law, to support the true finding on the allegation that the cocaine possessed for sale in count 1 weighed over one kilogram (Health & Saf. Code, § 11370.4, subd. (a)(1)).
Health and Safety Code section 11370.4 provides, in pertinent part: "(a) Any person convicted of a violation of, or of a conspiracy to violate, Section 11351, 11351.5, or 11352 with respect to a substance containing heroin, cocaine base as specified in paragraph (1) of subdivision (f) of Section 11054, or cocaine as specified in paragraph (6) of subdivision (b) of Section 11055 shall receive an additional term as follows: [¶] (1) Where the substance exceeds one kilogram by weight, the person shall receive an additional term of three years."
The evidence here established that defendant possessed for sale 988.74 grams of cocaineless than one kilogram. This was clearly insufficient to support the one kilogram quantity enhancement of Health and Safety Code section 11370.4, subdivision (a)(1). The evidence also established that defendant possessed for sale 24.64 grams of cocaine base on the same date. Possession for sale of the cocaine was charged as a violation of Health and Safety Code section 11351 (count 1), while possession *94 for sale of the cocaine base was charged as a violation of Health and Safety Code section 11351.5 (count 2).
During closing argument, the prosecutor urged the jury to find the quantity enhancement allegation true by "considering] all of the items added together. It's the combined weight of the same substance.... [B]oth of these are cocaine, and cocaine base is a more pure form, but definitely both cocaine."
The trial court instructed the jury as follows: "It is alleged in Counts 1 and 2 that at the time of the commission of the crime of which the defendant is accused, he possessed a substance containing cocaine which exceeded certain weight requirements or certain weights, [¶] If you find the defendant guilty of the crimes charged in Counts 1 and 2, you must then determine whether this allegation is true." The trial court further instructed the jury that "[i]n computing the quantities involved, the aggregate or combined weight of two separate items of the same controlled substance determines whether the quantity exceeds one kilogram of the controlled substance."
Defendant contends it was improper for the jury to aggregate the cocaine and cocaine base in order to find true the quantity enhancement under Health and Safety Code section 11370.4, subdivision (a)(1). He contends that the quantity enhancement applies where the substance weighs over one kilogram and contains cocaine or cocaine base, but does not apply where two different substancesone containing cocaine and one containing cocaine base weigh less than one kilogram each but over one kilogram when aggregated.
No published case has addressed this issue. Cases discussing the measurement of the quantity enhancement have held that it is measured by the weight of the substance containing the cocaine, cocaine base, or heroin, regardless of its purity. (People v. Pieters (1991) 52 Cal.3d 894, 276 Cal.Rptr. 918, 802 P.2d 420.) Courts have also held that the quantity enhancement is not applicable to precursor substances (People v. Lopez (1993) 20 Cal.App.4th 897, 900, 24 Cal.Rptr.2d 649) or to substances that are "merely offered or negotiated" and not in existence. (Valenzuela v. Superior Court (1995) 33 Cal.App.4th 1445, 1452, 39 Cal.Rptr.2d 781; cf. People v. Howard (1995) 33 Cal.App.4th 1407, 39 Cal.Rptr.2d 766.)
The most similar case is People v. Estrada (1995) 39 Cal.App.4th 1235, 46 Cal. Rptr.2d 385. There, the court held that two different batches of the same substance may be aggregated in determining whether a particular quantity enhancement applies, even if the two different batches support two separate counts. In Estrada, the defendants transported 29 kilograms of cocaine. A subsequent search of their apartment revealed that they possessed for sale another 38 kilograms of cocaine. They were convicted of three counts: possession for sale of cocaine, transportation of cocaine, and conspiracy to transport cocaine. The trial court imposed a 40 kilogram quantity enhancement (Health & Saf.Code, § 11370.4, subd. (a)(5)) as to the possession for sale count. On appeal, the defendants argued that imposition of the 40 kilogram enhancement was improper because only 38 kilograms supported the possession for sale count, since the other 29 kilograms gave rise the transportation count. The defendants relied on cases holding that a person cannot be convicted of possession for sale of a substance that is a necessary part of a transportation count. The court rejected the arguments, holding that the two batches of cocaine could be aggregated for purposes of the quantity enhancement. The court explained, "The quantity enhancement *95 is concerned with the total amount of drugs involved, not the varied crimes for which the defendant may be held culpable. [Citation.]" (People v. Estrada, supra, 39 Cal.App.4th at p. 1240, 46 Cal.Rptr.2d 385.)
Estrada is of little assistance here. In the instant case, we are not concerned with aggregation of two separate batches of the same substance. This case presents the question whether a quantity enhancement may be supported by aggregation of two different substances: cocaine and cocaine base. Defendant possessed for sale less than one kilogram of cocaine and less than one kilogram of cocaine base. Only when the two substances are aggregated does the weight exceed one kilogram.
In construing Health and Safety Code section 11370.4, we apply settled rules of statutory construction. "`The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. [Citation.] Ordinarily, the words of the statute provide the most reliable indication of legislative intent. [Citation.] When the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. [Citations.]' [Citation.] `"When the language is susceptible of more than one reasonable interpretation ..., we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part."' [Citation.]" (People v. Jefferson (1999) 21 Cal.4th 86, 94, 86 Cal.Rptr.2d 893, 980 P.2d 441.)
The Legislature has specified that its purpose in enacting Health and Safety Code section 11370.4 was "`to punish more severely those persons who are in the regular business of trafficking in, or production of, narcotics and those persons who deal in large quantities of narcotics as opposed to individuals who have a less serious, occasional, or relatively minor role in this activity.' (Stats.1985, ch. 1398, § 1, p. 4948.)" (People v. Pieters, supra, 52 Cal.3d at p. 898, 276 Cal.Rptr. 918, 802 P.2d 420.) With this purpose in mind, we begin our analysis of the statute.
The quantity enhancement applies where the defendant has been convicted of "a violation of, or of conspiracy to violate, Section 11351, 11351.5, or 11352 with respect to a substance containing heroin, cocaine base as specified in paragraph (1) of subdivision (f) of Section 11054, or cocaine as specified in paragraph (6) of subdivision (b) of Section 11055...." (Health & Saf. Code, § 11370.4, subd. (a)). The statute thus lists the qualifying violations and the qualifying substances in the disjunctive. The violation must involve "a substance containing heroin, cocaine base ..., or cocaine...." (Italics added.)
Read literally, the quantity enhancement applies to "a violation" of the specified statutes with respect to "a substance" containing heroin, cocaine base, or cocaine, which weighs over one kilogram. "[T]he term `substance' refers to one of these enumerated drugs.. .." (People v. Lopez, supra, 20 Cal.App.4th at p. 902, 24 Cal. Rptr.2d 649, italics added.) Under a common-sense interpretation of this language, the quantity enhancement applies where one of the qualifying substances weighs over a kilogram. Nothing in the statutory language indicates that multiple substances charged as different violations may be aggregated.
Here, the quantity enhancement was alleged as to count one, "a violation" of Health and Safety Code section 11351, possession for sale of cocaine. The evidence established that the cocaine involved in *96 that count weighed less than one kilogram. There was no evidence that defendant possessed for sale another batch of cocaine at the same time. Although there was evidence that defendant possessed for sale a batch of cocaine base at the same time, the statute clearly states that the quantity enhancement applies to "a substance" containing either cocaine or cocaine base. Moreover, the possession for sale of the cocaine base was charged in count 2, separately from the possession for sale of cocaine, and there was no quantity enhancement alleged as to that count.
We have reviewed the legislative history of Health and Safety Code section 11370.4. The legislative history does not address the question whether different narcotics substances may be aggregated to reach the minimum quantity required for imposition of the enhancement.
The People do not dispute that a literal reading of the statute would result in a finding that the quantity enhancement did not apply here. They simply argue that defendant "posed the societal threat which the statute intended to address" because he possessed for sale a large amount of cocaine and cocaine base. In fact, they contend that the quantity enhancement would be applicable where the defendant possessed for sale "334 grams of cocaine, 334 grams of cocaine base and 334 grams of heroin."
While it may be true that defendant's possession for sale of the cocaine and cocaine base posed a significant danger, "it does not necessarily follow that the enhancement should apply." (People v. Lopez, supra, 20 Cal.App.4th at p. 903, 24 Cal.Rptr.2d 649.) The Legislature could rationally determine that the quantity enhancement should apply only where a defendant possesses for sale over one kilogram of a particular substance, so as to ensure that the punishment for the offense with be commensurate with the defendant's culpability. Where the defendant possesses for sale less than a kilogram of cocaine, his or her punishment is a term of two, three or four years. (Health & Saf. Code, § 11351.) Where the weight of the substance is over one kilogram, the punishment is increased by a term of three years. (Health & Saf.Code, § 11370.1, subd. (a)(1).) Where the defendant possesses for sale cocaine, cocaine base, and heroin, he or she may receive three separate convictions and three separate sentences. The fact that a person dealing in multiple substances may receive multiple convictions and sentences ensures that punishment will be commensurate with culpability.
Applying settled rules of statutory construction, we conclude that the evidence was insufficient, as a matter of law, to support the quantity enhancement alleged pursuant to Health and Safety Code section 11370.4, subdivision (a), since there is no indication that the statute permits aggregation of different substances in calculating quantity. We will therefore order that enhancement stricken. We do, however, respectfully invite the Legislature to amend the statute if it determines that the issue requires clarification.

D. CALJIC No. 17.41.1
The trial court instructed the jury pursuant to CALJIC No. 17.41.1, as follows: "The integrity of a trial requires that jurors at all times during their deliberation conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."
*97 Defendant contends the above instruction interferes with his right to a unanimous jury verdict and his right to trial by an impartial jury. (U.S. Const., 6th Amend.; Cal. Const., Art. I, § 16.) He claims the instruction inhibits free and open jury deliberations by informing the jurors that their statements may be reported to the judge. He further claims the instruction coerces juror unanimity by deterring minority jurors from expressing opinions contrary to the opinion of the majority.
Jurors have a duty to deliberate and follow the court's instructions on the law. (See People v. Daniels (1991) 52 Cal.3d 815, 865, 277 Cal.Rptr. 122, 802 P.2d 906; People v. Thomas (1994) 26 Cal. App.4th 1328, 1333, 32 Cal.Rptr.2d 177.) The trial court may hold a hearing upon a report of such misconduct (People v. Williams (1997) 16 Cal.4th 153, 230, 66 Cal.Rptr.2d 123, 940 P.2d 710), but such a hearing is limited by the trial court's duty not to inquire into a juror's thought processes (Evid.Code, § 1150, subd. (a); In re Hamilton (1999) 20 Cal.4th 273, 294, 84 Cal.Rptr.2d 403, 975 P.2d 600). At the hearing, the accused juror may deny the accusation and in turn inform the court that the majority jurors are pressuring, intimidating, or coercing him or her because of disagreements over the outcome of the case. The trial court may, in its discretion, admonish or remove the juror only if it finds that the juror in fact refused to deliberate or follow the court's instructions. (Pen.Code, § 1089; People v. Feagin (1995) 34 Cal.App.4th 1427, 1434-1435, 40 Cal.Rptr.2d 918.)
As jurors deliberate in private, they alone would know when a juror commits misconduct by refusing to deliberate or follow the court's instructions on the law. CALJIC No. 17.41.1 instructs the jurors that it is their duty to inform the court of such misconduct, which, if not prevented or remedied, taints the integrity of the judicial process. (People v. Marshall (1990) 50 Cal.3d 907, 951, 269 Cal.Rptr. 269, 790 P.2d 676.)
We do not believe that CALJIC No. 17.41.1 inhibits free and open jury deliberations or coerces juror unanimity. CALJIC No. 17.41.1 is designed to expose jurors only if and when they expressly refuse to perform their duty to deliberate and follow the court's instructions. The instruction does not unlawfully require jurors to expose the substance of another juror's thought processes (see Code Civ. Proc. § 206, subd. (a)); it requires only the revelation of a fellow juror's express misconduct. CALJIC No. 17.41.1 does not intimidate the jurors into agreement with regard to their duties of fact-finding or applying the law. It contains no suggestion that a disagreement over sufficiency of the evidence constitutes grounds for reporting a fellow juror to the trial court. The instruction does not convey any possibility that the content of the jury's deliberations will be revealed or that the trial court will remove a juror for mere disagreement with other jurors.
Moreover, an instruction is not considered in isolation, but in the context of the other instructions given. (People v. Castillo (1997) 16 Cal.4th 1009, 1016, 68 Cal.Rptr.2d 648, 945 P.2d 1197.) Here, the trial court gave additional instructions regarding the jurors' duties and obligations. Pursuant to CALJIC No. 1.00, it instructed them that they "must accept and follow the law as I state it to you regardless of whether you agree with the law." It instructed them that they "must not be influenced by pity for or prejudice against a defendant" and that they "must not be influenced by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, public feeling." It instructed *98 them to "conscientiously consider and weigh the evidence, apply the law and reach a just verdict regardless of the consequences." Finally, the trial court instructed the jury, pursuant to CALJIC No. 17.40, that each of the jurors was to "decide the case for yourself after discussion with the other jurors and not to "decide any question in a particular way because a majority of the jurors or any of them favor that decision." Viewing these instructions and CALJIC 17.41.1 together, we do not find a reasonable likelihood the jurors would believe they could coerce agreement from minority jurors by threatening to accuse them of misconduct. (See Estelle v. McGuire (1991) 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385.)
Finally, defendant argues that instructing the jury pursuant to CALJIC No. 17.41.1 is a structural error: one that defies analysis by harmless error standards and requires reversal without regard to the strength of the evidence or other circumstances. (See People v. Flood (1998) 18 Cal.4th 470, 493, 76 Cal.Rptr.2d 180, 957 P.2d 869.) Even assuming that CALJIC No. 17.41.1 is erroneous, we disagree that the error is one that necessarily infects the entire trial process and renders the trial fundamentally unfair. (See Neder v. United States (1999) 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35.) Rather, we agree with the court in People v. Molina (2000) 82 Cal.App.4th 1329, 1335, 98 Cal. Rptr.2d 869, that harmless error review is appropriate.
Here, there was no evidence that any juror reported or threatened to report misconduct by another juror. There was no evidence of jury deadlock or any hold-out jurors. The jury returned its verdicts just over two hours after retiring to deliberate.[2] (Cf. People v. Molina, supra, 82 Cal.App.4th at p. 1336, 98 Cal.Rptr.2d 869.) Each of the jurors affirmed the verdicts in the post-verdict jury poll. Thus, even if the trial court erred by instructing the jury pursuant to CALJIC No. 17.41.1, the error was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.)

E. Sentencing
Defendant's sentencing hearing was held on July 23, 1999. The trial court determined that "the first count, the possession for sale of the kilo of cocaine," was the most serious offense and that it would "form the basis of the primary term." The trial court then erroneously referred to count 1 as a violation of Health and Safety Code section 11351.5 (possession for sale of cocaine base), which is punishable by a prison term of three, four, or five years, and it imposed the "middle term of four years" for count 1. In fact, count 1 charged defendant with a violation of Health and Safety Code section 11351 (possession for sale of cocaine), which is punishable by a prison term of two, three, or four years.
The trial court imposed consecutive terms for the enhancement allegations associated with count 1: a four-year term for the firearm allegation (Pen.Code, § 12022, subd. (c)); a three-year term for the allegation of a prior narcotics offense conviction (Health & Saf.Code, § 11370.2, subd. (a)); a three-year term for the quantity enhancement (Health & Saf.Code, § 11370.4, subd. (a)(1)); a two-year term for the on-bail allegation (Pen.Code, § 12022.1), and a one-year term for the prior prison term allegation (Pen.Code, *99 § 667.5, subd. (b)). Thus, the aggregate term for count one was 17 years.
The trial court imposed a consecutive term of one year, four months (one-third of the middle term) for count 2 (possession of cocaine base, Health & Saf.Code, § 11351.5), and a consecutive term of eight months (one-third of the middle term) for count 3 (possession of a firearm by a felon, Pen.Code, § 12021, subd. (a)(1)), bringing the aggregate sentence to a prison term of 19 years.
The trial court imposed concurrent terms for count 5 (possession of cocaine, Health & Saf.Code, § 11350, subd. (a)), count 6 (possession of cocaine while armed with a firearm, Health & Saf.Code, § 11370.1, subd. (a)), and count 7 (the second count of possession of a firearm by a felon, Pen.Code, § 12021, subd. (a)(1)). It imposed concurrent terms for the second allegation of a prior narcotics conviction (Health & Saf.Code, § 11370.2, subd. (a)) and for the second and third prior prison term allegations (Pen.Code, § 667.5, subd. (b)).
The trial court did not impose sentence for counts 4 and 8 or any of the other enhancement allegations. It stated, "All other counts and special enhancements, sentencing is stayed at the discretion of the court pending service of the term imposed." The trial court also imposed fines and restitution.
On August 11, 1999, the trial court filed an order entitled, "AUGMENTATION OF SENTENCE RECORD." In that order, the trial court first ordered stricken the concurrent terms for the second allegation of a prior narcotics conviction (Health & Saf.Code, § 11370.2, subd. (a)) and the second and third prior prison term allegations (Pen.Code, § 667.5, subd. (b)). Second, it ordered the concurrent term for count 5 (possession of cocaine, Health & Saf.Code, § 11350, subd. (a)) stayed pursuant to section 654. Third, it ordered the consecutive term for count 3 (possession of a firearm by a felon, Pen.Code, § 12021, subd. (a)) to run concurrently. Finally, the trial court "clarified" the fines imposed.
Defendant contends the trial court's augmentation order was an unauthorized sentence. He points out that Penal Code section 1170, subdivision (d) permits a trial court to recall a sentence within 120 days of a prison commitment and to "resentence the defendant in the same manner as if he or she had not previously been sentenced...." He further points out that a resentencing hearing, like an initial sentencing hearing, requires a defendant's presence. (People v. Fuhrman (1997) 16 Cal.4th 930, 948, 67 Cal.Rptr.2d 1, 941 P.2d 1189.)
The People concede that the augmentation order was void, and they contend the original sentence should be reinstated. Defendant claims the original sentence was invalid in several respects. We will remand for resentencing; we provide the following for the trial court's direction.
First, the trial court should determine whether to impose the middle term of three years for count 1 (Health & Saf. Code, § 11351) or whether there are reasons justifying imposition of the upper term of four years or the lower term of two years. (See Cal. Rules of Court, rule 4.420(a).)
Second, the terms for the second allegation of a prior narcotics conviction (Health & Saf.Code, § 11370.2, subd. (a)) and the second and third prior prison term allegations (Pen.Code, § 667.5, subd. (b)) should be imposed consecutively or else stricken. (See Pen.Code, § 667.5, subd. (b) [prior prison term enhancement "shall" be imposed "in addition and consecutive to any other prison terms"]; Health & Saf.Code, § 11370.2, subd. (a) [trial court "shall" impose *100 "a full, separate, and consecutive three-year terra" for each prior narcotics conviction enhancement "in addition to any other punishment authorized by law, including Section 667.5 of the Penal Code"]; Pen.Code, § 1170.1, subd. (d); People v. White Eagle (1996) 48 Cal.App.4th 1511, 1521, 56 Cal.Rptr.2d 749.)
Third, if the trial court imposes the on-bail enhancement associated with count 1, the on-bail enhancements associated with counts 2 and 3 (Pen.Code, § 12022.1) should be stricken. "[Commission of a crime while on bail goes to the nature of the offender, not the nature of the crime, and therefore only one enhancement may be imposed." (People v. McNeely (1994) 28 Cal.App.4th 739, 743, 33 Cal.Rptr.2d 582.)
Fourth, the arming enhancements associated with counts 2, 4, and 5 (Pen.Code, § 12022, subds. (a) & (c)) may be stayed if the underlying count is stayed pursuant to Penal Code section 654 (People v. Smith (1985) 163 Cal.App.3d 908, 914, 210 Cal. Rptr. 43), or they may be stricken if supported by a statement of reasons (People v. Price (1984) 151 Cal.App.3d 803, 818, 199 Cal.Rptr. 99).
Fifth, if the trial court chooses to stay the terms for counts 4 and 8, it should specify that it is doing to pursuant to section 654.
Finally, the trial court may correct any errors with respect to the imposition of fines upon resentencing.

III. DISPOSITION
The judgment is reversed and the matter is remanded for resentencing, in accordance with this opinion. The enhancement alleged pursuant to Health and Safety Code section 11370.4, subdivision (a)(1) is ordered stricken. On remand, the court shall not impose a sentence longer than 19 years. After resentencing, the trial court shall prepare a new abstract of judgment and send a certified copy thereof to the Department of Corrections.
COTTLE, P.J., and WUNDERLICH, J., concur.
NOTES
[1] Under Penal Code section 647, subdivision (h), a person commits a misdemeanor if he or she "loiters, prowls, or wanders upon the private property of another, at any time, without visible or lawful business with the owner or occupant." The statute specifies that "`loiter' means to delay or linger without a lawful purpose for being on the property and for the purpose of committing a crime as opportunity may be discovered."
[2] The trial court finished instructing the jury at 4:30 p.m. on May 26, 1999. It gave the jury a half-hour to select a foreperson and get "organized." The jury began deliberating the following day at 9:00 a.m. and returned its verdicts at 11:15 a.m.